**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**PATRICIA HARRIS,**

        **Plaintiff,**

**v.**                                                              **Case No. 8:13-cv-3234-T-23TBM**

**CAROLYN W. COLVIN, Acting**
**Commissioner of the United States**
**Social Security Administration,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review of the denial of her claim for Social Security disability benefits and Supplemental Security Income payments. Because the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence, I recommend that it be affirmed.

A.

Plaintiff applied for disability benefits and Supplemental Security Income in January 2010, alleging disability as of April 7, 2009, by reason of chronic obstructive pulmonary disease (COPD), edema and pain in her lower extremities, arthritis, and depression. Plaintiff's applications were denied originally and on reconsideration.

Plaintiff next received a *de novo* hearing on November 3, 2011, before an Administrative Law Judge (hereinafter "ALJ"). Plaintiff was represented at the hearing by

counsel and testified in her own behalf.  Plaintiff was forty-three years of age at the time of

her administrative hearing in November 2011.  She stands 5' 2" tall and weighed 200 pounds

at the time of her administrative hearing.  Plaintiff has a high school education and some

college.  She reported past work as a custodian, in-home health care provider, short order

cook, and CNA.

Plaintiff testified that she last worked in April 2009.  Her legs started hurting badly

and were swelling a lot.  She thought moving to a warmer climate might help, so she moved

to Florida.  She tried for a job at Walmart but didn't take the job because of her legs and she's

been seeing a doctor ever since.  She claims both mental and physical impairments.  She sees

a psychiatrist for anxiety and depression, and takes Lexapro for her depression.  She states

that Lexapro is not helping and that she locks herself in the bathroom and cries a lot.  She

cries three to four times a day and feels useless and worthless.  She claims the physical

problems contribute to her crying because she can't ride a bike or run with her daughter and

grandson.

As for her physical problems, her legs swell if she sits or stands for more than thirty

minutes.  When she can no longer stand the pain and the swelling gets too much, she lays

down and props her legs up for forty-five to ninety minutes.  The cause of this is unclear but

she claims to have been told the swelling could be associated with her lower back.  She was

also told that she has osteopenia in her lower lumbar spine.  She takes Lasix daily for the

edema and it helps.  She takes Levoxyl for her thyroid.  That condition does not interfere with

her ability to work.  She recently underwent arthroscropy on both of her knees and she takes

Flexeril for anti-inflammation.  The pain in her knees is worse now that it was before the

2

surgery and Flexeril puts her to sleep.  She takes 400 mg of etodolac for the pain.  She tries not to take that medicine too often because she does not want to be incoherent and unaware of what's going on around her because she has a grandson, a 12-year old, and mother who live with her.

She further testified that she has carpal tunnel syndrome, which was diagnosed about a year prior to the hearing.  The carpel tunnel is in both wrists, but the left is worse than the right.  She wears a brace and she can carry a gallon of milk.  The carpel tunnel prevents her from lifting with both hands, causes pain, and prevents her from writing for more than thirty minutes.

Her mother and daughter help her with the chores around the house.  She cannot sweep for more than fifteen minutes because her back, knees, and legs hurt.  When doing dishes, she has to lean against the sink because of her knees.

She doesn't want to go anywhere.  She will go to the grocery store or the doctor if she has to; otherwise, she stays home.  She cannot handle being around people.  (R. 61-78).

Additionally, Walter Todorowsky, a vocational expert ("VE"), testified in pertinent part on a hypothetical assuming a person of Plaintiff's age, education, and work experience capable of light exertional work but never climbing ladders, ropes, scaffolds, stairs, kneeling, or crawling; occasionally claiming ramps, balancing, stooping, and crouching; and avoiding concentrated use of hazardous machinery.  With such limitations, the individual would not be able to perform Plaintiff's past work, but could perform work such as final assembler/optical goods, food/beverage order taker, or food checker.  With the added limitations of unskilled

work, and/or the need for a sit/stand option up to 10% of the time, the individual would still be able to perform these type jobs.  (R. 78-87).

Also before the ALJ were medical records outlining the Plaintiff's medical history. These matters are addressed herein as necessary.

By his decision of December 20, 2011, the ALJ determined that while Plaintiff has severe impairments related to bilateral knee arthropathy, status post bilateral arthroscopy, obesity, depression, mild COPD, carpal tunnel syndrome, and bilateral leg edema of unknown etiology, she nonetheless had the residual functional capacity to perform a restricted range of sedentary work.  Upon this finding and the testimony of the VE, the ALJ concluded that Plaintiff could not perform her past work but could perform jobs available to her in the local and national economy.  Upon this conclusion, the Plaintiff was determined to be not disabled. (R. 35-43).  The Appeals Council denied Plaintiff's request for review (R. 7-10), and the ALJ's decision became the final decision of the Commissioner.

## B.

Entitlement to Social Security disability benefits and Supplemental Security Income payments requires the claimant establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months…."  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment," under the terms of the Act, is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards.  *See id.* at § 405(g).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (quotations omitted).  The Commissioner must apply the correct law and demonstrate that she has done so.  While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citations omitted).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses.  *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971).  Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence.  *Celebrezze v. O'Brient*, 323 F.2d 989, 990 (5th Cir. 1963).  Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled.  *Moore*, 405 F.3d at 1211.

In sum, the scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988).

C.

Plaintiff raises two claims on this appeal.  As stated by Plaintiff, the ALJ erred: (1) by failing to address her spinal impairment; and (2) by finding Plaintiff's allegations not credible.  (Doc. 21).

By her first argument, Plaintiff claims that the ALJ failed to consider Plaintiff's degenerative disc disease which resulted in pain and limited her range of motion.  She argues that remand pursuant to sentence four or six is merited for consideration of evidence from Dr. DiGeronimo and an MRI report demonstrating degenerative disc disease with retrolisthesis. Here, the ALJ's decision is silent with regard to a spinal impairment.  And, during the hearing, the ALJ incorrectly stated, "No doctor has thought it was necessary to get x-rays of your spine."  After noting that Plaintiff had complained of back pain to her doctor, the ALJ added, "You do not have degenerative disc disease, disk bulging, nothing [is] wrong with your back."  Moreover, in establishing that she did not have degenerative disc disease, the ALJ improperly relied on the treatment records of Dr. Amshel, who only treated Plaintiff for hemorrhoids.  She urges that her complaints of back pain are documented in the treatment notes from Dr. Abouhanna, Dr. Arain, and in ER records.  And, in June 2011, a DEXA scan revealed osteopenis at L4.  Then, in December 2011, just seven days after the hearing, an MRI ordered by Dr. DiGeronimo confirmed degenerative disc disease, retrolisthesis at L4 and L5 with a small disc protrusion.

Plaintiff argues that remand is required under either sentence four or sentence six of the Social Security Act based on these post-hearing records from Dr. DiGeronimo and the MRI report.  She urges that such records related to the back pain and symptoms she had

6

reported since June 2011.  Thus, the ALJ erred in failing to consider her reported back pain and the Commissioner erred in rejecting the MRI evidence as not relating to the period of time in question.

In response, the Commissioner argues that the ALJ properly evaluated Plaintiff's severe impairment and substantial evidence supports the ALJ's credibility findings.  First, the Commissioner asserts that Plaintiff has failed to satisfy her burden to show that any spinal impairment significantly affected her ability to work.  Moreover, even if her spinal impairment is severe, the error here is harmless error because the ALJ found in Plaintiff's favor at step two of the analysis and such is all that is required.  By the Commissioner's review, the medical evidence, including the report of Dr. DiGeronimo and the MRI report, does not reveal additional functional limitations not assessed by the ALJ.  Furthermore, the Appeals Council did not err in concluding that the MRI evidence did not relate to the relevant time period.  But, even if this was wrong, the MRI showed only degenerative disc disease with only a small disc protrusion causing no significant nerve root compromise.  Such was insufficient to warrant additional review and is insufficient for this court to order a sentence four remand under the *Ingram* decision.  A sentence six remand is inapposite to the circumstances, the Commissioner asserts.

Plaintiff is correct that the decision reflects nothing concerning complaints by the Plaintiff of back pain or of any medical records addressing such complaints.  However, in the particular circumstances of this case, where such condition was recognized by the ALJ at the hearing, I find no merit to the claim that such was not considered by the ALJ.  And, after reviewing carefully the medical evidence, I find no error requiring relief on this claim.  First,

7

as noted, the ALJ did consider the back condition.  Second, the record before the ALJ shows that Plaintiff did not, in either her administrative filings nor in testimony to the ALJ, base her claim of disability on any impairment in her low back.  Moreover, the medical evidence before the ALJ, reflected little, if anything, to require a conclusion that the condition was severe in contemplation of the Act.

On this record, I cannot agree that the ALJ failed to consider her complaints of low back impairment/pain.  While the ALJ was somewhat confrontational in his approach at the hearing, his comments reflected that he had reviewed the record available at that point in time and concluded there was no severe condition.  And, as he stated, at that point Plaintiff had no x-rays of her spine, nor medical proof of a severe degenerative disc disease or bulging discs.  It is unclear that the ALJ had the records from Dr. DiGeronimo, but in any event, he had ordered additional tests and was still evaluating the condition.  As the ALJ also recognized, the one objective test of the lower extremities showed normal results.  Thus, it is clear that the ALJ considered the condition.[1]

As for the medical evidence related to this condition, Plaintiff first sought care at Brandon Regional Hospital in July 2011for complaints of lower left back pain with onset that same date.  She gave history of past back pain and disc disease.[2]  (R. 781).  Findings on

---

[1]Any suggestion of error in the ALJ's failure to address the MRI evidence is misplaced as such exam was taken after the date of decision and, as discussed below, provided to the Commissioner several months after the decision.

[2]The only previous medical record of a back issue is from June 2011, when Dr. Anthony Abouhanna referred Plaintiff for a Dexa scan or bone density scan for complaints of pain in soft tissues of her leg.  By this scan, Plaintiff had normal bone density in the femoral bones and lumbar bone.  The report also noted L4 osteopenia.  (R. 757).

physical examination revealed moderate vertebral point tenderness; soft tissue tenderness; mildly limited range of motion in lumbar spine; decreased flexion and extension; with no spasm.  Extremities exhibited normal range of motion and were without tenderness.  Clinical impression was for "acute left sided sciatica.  No sensory loss or motor deficit."  (R. 782).  Plaintiff was prescribed Flexeril, Ultram, and a Medrol Dosepak and was discharged.  (R. 783).  The next records appear to be those from Dr. Amshel in September and October 2011.  While he saw Plaintiff for treatment of her hemorrhoids, his physical examination records from two dates fail to reflect complaints about, treatment for, or findings about back pain.  (R. 827-30, 836-39).  In October 2011, at a follow-up exam of her knee by Dr. Arain, Plaintiff noted doing well with her knee but experiencing back pain on her left side.  She was advised by Dr. Arain to continue exercising and to return to the clinic for follow up on her back.  (R. 850).  On November 10, 2011, one week after her administrative hearing, Plaintiff was seen by Dr. Abouhanna for complaints of low back pain for six months.  By this report, Plaintiff indicated the onset was intermittent and the pain was described as aching, aggravated by physical activity, and of mild to moderate severity.  (R. 854-57).  Dr. Abouhanna assessed "low back pain" and ordered an x-ray of the lumbar sacral spine.  Plaintiff was advised to use moist heat, gentle stretching, with no lifting of heavy objects.  Regarding her claims of paresthesias/numbness in her extremities, Plaintiff was referred to Dr. DiGeronimo, a neurologist, for evaluation.  (R. 855).

Dr. DiGeronimo saw Plaintiff on November 22, 2011, about three weeks after her hearing.  On physical examination, he reports normal cranial nerves with normal range of motion in the head and neck; numbness and tingling in her extremities, and pain radiating in

her legs, but she exhibited negative Tinel's, Phalen, and Romberg signs.  The doctor noted that Plaintiff's station and gait was intact and that she could toe/heel ambulate without difficulty.  His impression was for neuropathy and radiculopathy of the lumbar spine.  He ordered a rheumatology consult, MRI of the lower spine, and nerve conduction studies of her extremities and an arterial ultrasound of the lower extremities.[3]  No functional limitations were noted nor were any restrictions placed on Plaintiff.  (R. 888-89).  The arterial ultrasound on December 15, 2011, just five days before the date of the ALJ's decision, revealed normal findings.  (R. 883).

While Plaintiff argues error in the failure of the ALJ to consider her severe degenerative disc disease, such condition was not revealed in the records available to the ALJ.  As just outlined, her medical records for complaints of back pain first appear in July 2011 and reflect an intermittent condition with minimal findings.  By a fair reading, these records do not necessarily describe a severe impairment.  Indeed, these records do not speak to limitations apart from one note prescribing continued exercise but no heavy lifting.  Contrary to any claim otherwise, her first examination in July 2011 found no evidence of any sensory loss or motor deficit and only mildly limited range of motion.  Four months later, just days before her hearing, clinical tests were entirely negative despite Plaintiff's complaints and Plaintiff's station and gait were intact and she could toe/heel ambulate without difficulty.  The only test results available to the ALJ revealed normal findings in the lower extremities and normal bone density.  In sum, there is substantial evidence to support the ALJ's conclusion,

---

[3]The records were not thereafter updated with any rheumatology report or nerve study. As discussed below, a MRI report was submitted to the Appeals Council.

as voiced at the hearing, that Plaintiff did not evidence a severe spinal impairment and, when coupled with the fact that Plaintiff wasn't claiming disability by reason of her low back, the ALJ can hardly be faulted for not addressing it more specifically in the decision.

Insofar as the argument is that the ALJ erred at step two of the five-step evaluation process dictated by the Regulations in failing to identify the back impairment as a severe condition, the argument fails. At step two of the five-step evaluation process prescribed by the regulations, the ALJ is called upon to determine whether a claimant's impairments are severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). In application, this inquiry is a "threshold" inquiry. It allows only claims based on the slightest abnormality to be rejected. *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984). An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities.[4] 20 C.F.R. §§ 404.1521(a); 416.921(a). Thus, the severity of a medically ascertained impairment is measured in terms of its effect upon a claimant's ability to work and not simply in terms of "a deviation from purely medical standards of bodily perfection or normality." *Wind v. Barnhart,* 133 F. App'x 684, 690 (11th Cir. 2005) (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)).

---

[4]The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling, as well as capacities for seeing, hearing, and speaking; understanding, remembering and carrying out simple instructions; responding appropriately to supervisors and fellow employees and dealing with changes in the work setting; and the use of judgment. *Id.*

However, "the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement at step two." *See Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987); *see also Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x. 823, 824-25 (11th Cir. 2010) ("Even if the ALJ erred in not indicating whether [a condition] was a severe impairment, the error was harmless because the ALJ concluded that [claimant] had a severe impairment: and that finding is all that step two requires." Here, the ALJ credited Plaintiff with several severe impairments at step two. Thus, the failure to find her back condition a severe impairment merits no relief at this step.

Most significantly, Plaintiff fails to demonstrate that her back pain, by whatever diagnosis, caused her functional limitations which were not otherwise considered or accounted for by the ALJ in his RFC assessment for a reduced range of sedentary work. In sum, I find no error on the part of the ALJ which merits relief. The matter of the Appeals Council review is discussed below.

By her second argument, Plaintiff claims the ALJ's credibility determination is unsupported by substantial evidence. She disputes certain of the ALJ's reasons for concluding that while she had some limitations from her impairments, they were not of the severity to preclude all work. Thus, she claims that the ALJ's findings that she had no acute or severe COPD attacks is rebutted by a June 2009 CT scan and the records from Dr. Moorthy. Further, the ALJ's finding that her knees improved after surgery was only partially accurate as reflected in Dr. Arain's October 2011 report which noted the knees were better, but she still had sightly limited and painful range of motion. Moreover, the ALJ's comment

that while Plaintiff complained of leg edema of unknown etiology and nothing could be found to support this, to the contrary, the edema and leg pain were well documented even if the cause was not. In any event, the lack of a definitive diagnosis of the cause of the condition does not render Plaintiff's subjective complaints not credible. She also criticizes the ALJ for having and expressing a pre-determined position that her edema was not going to demonstrate that she could not do sedentary work. Finally, the ALJ's finding that the treatment notes did not mention any depression and that she had no history of mental health treatment except after her divorce ignores that Dr. Abouhanna first prescribed Lexapro for depression in January 2010; consulting examiner, Dr. Foster, confirmed the diagnosis for depressive disorder; Plaintiff underwent counseling and treatment between February and June 2011; and her dosage of Lexapro was increased and Trazadone was added to her medications. In sum, she argues the ALJ's credibility determination was flawed and a remand is in order.

On this second claim, the Commissioner responds that the ALJ properly applied the pain standard, articulated adequate reasons for discrediting Plaintiff's subjective complaints, and that substantial evidence supports his reasoning. While Plaintiff complained of COPD, recent testing showed only mild restrictions. The ALJ fairly assessed the medical records concerning her edema and leg pain and also knee surgeries. Such did not support disabling limitations. As for her mental limitations, while her primary doctor did prescribe Lexapro, his notes reveal only two discussions of her depression. And, she had a competitive work history and the consulting examiner found Plaintiff intact on his examination with no severe functional limitations. Moreover, administrative function reports reflected she was capable of

a range of activities with family and friends.  Here, the ALJ applied the correct standard and the substantial evidence supports the conclusion to find Plaintiff less than fully credible.

In this Circuit, subjective complaints such as pain, fatigue, or dizziness are governed by a three-part "pain standard" that applies when a claimant attempts to establish disability through subjective symptoms.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Under this standard, the claimant must show evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged symptom arising from the condition or evidence that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.  *See id.; Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Where such showing is made, the Regulations dictate that the ALJ then evaluate the intensity and persistence of the symptoms to determine how such limit the claimants capacity for work.  20 C.F.R. §§ 404.1529(c); 416.929(c).  Relevant factors in this consideration include the objective medical evidence, evidence of factors that precipitate or aggravate the symptoms, medications and treatments available to alleviate the symptoms, how the symptoms affect daily activities, and past work history.  *Id.*  A claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability.  *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (citations omitted).

If the ALJ determines not to credit subjective testimony, he must articulate explicit and adequate reasons for his decision.  *Dyer*, 395 F.3d at 1210 (citing *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995)).  Such reasons must be supported by substantial evidence and "take into account and evaluate the record as a whole."  *McCruter v. Bowen*,

791 F.2d 1544, 1548 (11th Cir. 1986).  A reviewing court will not disturb a clearly articulated

credibility finding with substantial supporting evidence in the record.  *Foote*, 67 F.3d at 1562

(citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)).

Here, after recognizing the applicable regulatory standard (R. 39),[5] the ALJ

summarized Plaintiff's testimony at the hearing as follows:

> At the hearing, the claimant testified that she has been taking prescription
> medication for depression for about a year.  She stated that family problems
> and health issues bother her; however, her doctor has not told her that she
> cannot work.  She stated that she locks herself in the bathroom and cries.  The
> claimant testified that she is unable to sit for more than 30 minutes and stand
> for more than 30 minutes.  She stated that when her pain gets bad she is unable
> to stand it.  She lied down and props her legs up for an hour and a half.  The
> lower pain in her legs feels knotted and the bones hurt.  She was in the hospital
> in June and had x-rays.  She stated that she had edema and takes Lasix
> everyday, which helps.  She also take thyroid medication, but this does not
> interfere with her working.  She testified that she takes anti-inflammatory for
> her knees.  She testified that both her wrists hurt, and she is unable to lift write
> for more than 30 minutes.  She feels useless and worthless.  She is unable to
> ride a bike or run and play with her grandson.  Her mother and daughter help
> her around the house.  She cannot sweep the floor and she does not want to go
> anywhere or be around people.  If she has to go to the grocery store, she gets
> what she has to get and then leaves.  She stated that she stopped working in
> April 2009 because her knees and legs were bothering her.

(R. 39).  Thereafter, the ALJ reviewed treatment or examination notes from Drs. Moorthy,

Foster, Arain, Bandyk, Amshel, and those from Dr. Abouhanna, along with the RFC

assessments of nonexamining doctors.  The ALJ then stated:

> In sum, while the claimant does have some limitations from her impairments
> they are not to the severity as to preclude all work activity.  The claimant
> alleged that she suffers from chronic obstructive pulmonary disease; however,

---

[5]The ALJ cited the regulations at 20 C.F.R. §§ 404.1529 and 416.929, together with
SSRs 96-4p and 96-7p.  Proper application of the regulatory standard will satisfy this circuit's
pain standard.  *See Wilson v. Barnhart,* 284 F.3d 1219, 1225-26 (11th Cir. 2002).

she has had no acute or severe attacks.  Her current pulmonary function test showed only mild restrictions.  She was hospitalized in 2009 with pain and swelling of the right lower extremity; however, Doppler showed no diverticulitis and chest CT was normal (no emboli).  She also does not suffer from chest pain or shortness of breath.  Current examinations showed clear lungs, only trace edema, no calf tenderness, and no neurological deficits.  Other tests that the claimant had in the past were EKG's and CT angiograms, which were both normal.  Pulmonary function test in April 2010 revealed no listing level results.  In regards to the claimant's knees, she underwent bilateral arthroscopies and office visit in 2001 showed that she was doing well.  She complained of leg edema, of unknown etiology and nothing could be found to support this.  In regards to any mental issues she noted that she was taking Lexapro given to her by her primary care physician.  Treatment notes did not mention any depression.  She had no history of mental health treatment except for after her divorce.  She had a competitive work history and her neuro-cognitively she was intact.  She had a global assessment of function (GAF) of 70.  Functional reports found that she cared for her daughter and grandchild.  She maintained her personal care appropriately, prepared full meals daily, did routine household chores, drove, left home alone, shopped, and managed her own finances.  She had no significant reduction in attention span and got along with her family, friends, and neighbors.

(R. 41).  Plaintiff urges the statements by the ALJ concerning her COPD, knees, leg swelling/edema, and depression are not supported by the evidence and offer no basis for discounting her credibility.  I have reviewed the record as it relates to each of these conditions and conclude that, on the whole, the ALJ has articulated adequate findings from that record and other grounds for concluding that Plaintiff overstated her subjective complaints.

Regarding her COPD,[6] while the evidence supported the conclusion such was a severe impairment, Plaintiff does not identify particular records which undermine the conclusion of the ALJ that such would not prevent work, in particular, sedentary work.  Thus,

---

[6]On this impairment, it is worth noting that Plaintiff was a smoker despite the condition.  And, significantly, she did not identify any adverse symptoms related to her COPD when testifying before the ALJ.

while there were objective findings from 2009 of mild emphysematous changes and likely atelectasis in both lungs (R. 316, 321), and of "chronic mosaic pattern in the lung bases [suggesting] interstitial lung disease" (R. 338), the records related to this condition are relatively sparse and I find none showing debilitating acute or chronic attacks.[7] Dr. Moorthy's April 2010 pulmonary function test is not shown to have revealed listing level results. By his testing, the condition suggested moderate obstructive and restrictive lung disease. The doctor offered no other opinion related to the functional import of the condition. (R. 327-33). Moreover, there are notations in other treatment notes from other times and other treating doctors reflecting clinical findings of "clear lungs" and "no shortness of breath." Her records reveal she was prescribed medication to address the condition and it appears to have worked most of the time. By my consideration, the ALJ's conclusions are properly read to reflect his recognition of a severe condition but one that would not prevent her from a restricted range of sedentary work and surely not one preventing her from any work. While Plaintiff urges this record offers no basis to discount her subjective testimony, she does not demonstrate this from the record that the ALJ's conclusion that her COPD was not so severe as she claimed is in error or that it is not supported by substantial evidence. In short, it is so supported.

---

[7]The closest record suggesting an acute attack is revealed in November 2011 notes from Brandon Regional. On November 15, 2011, some twelve days after her hearing, Plaintiff sought treatment for shortness of breath. She was admitted for "COPD exacerbation" and discharged three days later. (R. 859-81). The findings reflected in the notes from this admittance are similar to earlier findings. No restrictions beyond a "low-salt diet" and "exercise as tolerated" were imposed at discharge. (R. 860).

Plaintiff next challenges the finding of the ALJ concerning her knees that she was "doing well" post surgery.  Conceding that her knee condition did improve after surgery, and that Dr. Arain reported she was better, she urges that the record also shows her problems were not completely resolved and that Dr. Arain also noted a slightly limited and painful range of motion.  She questions how these records rendered Plaintiff not credible.  And, once again, I find that insofar as the finding was made in support of the conclusion that Plaintiff was not as limited by her knees as she claimed, there is no error requiring remand.

Dr. Arain's records did reveal generally good results from the knee procedures performed in January and March 2011.  (R. 434-36).  Post-surgery, the doctor's notes indicate Plaintiff reported doing much better, especially in the right knee.  (R. 430-31, 815-21).  In the last note from Dr. Arain from October 2011, he stated that Plaintiff was doing "fairly well" in the knees but reporting back pain.  "She walks fairly well. The range of motion of the knees was slightly painful and limited.  No instability.  Drawer's sign was negative."  (R. 850).  Plaintiff questions how such a notation reflects that she is not credible.  The reasonable, record based-answer is that this evidence did not reveal a condition nor a medical opinion that would account for the sitting, standing, and walking limitations Plaintiff claimed by reason of her lower extremities.  Once again, the record shows the ALJ fairly credited the impairments but concluded that the limitations associated with the impairments were not as severe as claimed.  Clearly, there is nothing in Dr. Arain's notes that would demonstrate findings to account for the limitations she claimed.  On the contrary, in a light most favorable to Plaintiff, he found only a "slightly" limited and painful range of motion of the knees and no instability.  Such finding does serve to undermine Plaintiff's claim that this condition would prevent her

from any work, even sedentary work.  And, again, Plaintiff does not demonstrate from this or any other record that her knee condition was so bad as to prevent the performance of a limited range of sedentary work.

Next, Plaintiff complains the ALJ's findings about her edema were not entirely correct.  Thus, the records reflect treatment for and confirmation of leg edema.  Although the source of the problem was unknown, her thyroid condition was suspected.  In any event, the lack of such a specific diagnosis does not render her allegations incredible.  Finally, she criticizes the ALJ for his handling of this condition at the hearing.

Here, I think Plaintiff correct that, in and of itself, the ALJ's statement that the cause of her leg edema was unknown and nothing could be found to support it offers no basis for discrediting her claim that she suffered such condition.  The fact that the cause of the intermittent condition was not known does not alter the fact that pedal edema is recognized at various points in the medical record.  However, this was not the sole basis offered for discounting her credibility concerning the functional import of her edema.  Ultimately, Plaintiff is again discredited on this claim by the medical evidence.  Thus, as noted by the ALJ, when physical examination revealed edema, such was often noted as only trace edema, with no calf pain and no neurological deficits.  Moreover, as noted earlier in the decision, vascular testing (by Dr. Bandyk) for complaints of leg swelling and pain was normal.  (R. 514-17).  While the ALJ was perhaps overly confrontational on this point in light of the non-adversarial nature of the proceeding, the ALJ's challenge to counsel at the hearing to show him records which would demonstrate that the edema would prevent even sedentary work was

a fair challenge.  And, both at the hearing and on this appeal, Plaintiff fails to make that demonstration from the medical record as a whole.

My review of treatment notes, in particular those from Dr. Abouhanna, confirm the adequacy of the ALJ's rationale concerning edema.  The records show that Plaintiff did complain intermittently of leg swelling.  On some occasions, such condition was noted on physical examination and at other times it was not found.[8]  While there is a suggestion that the condition required her to elevate her legs, I can find only one medical reference when Plaintiff was instructed to do so.  Thus, in an emergency room record from May 2010, she was told to elevate her leg above chest level until better.  (R. 371, 795).  Otherwise, I can find only one other such reference where Plaintiff made this claim – in a notation from a November 10, 2011 report by Dr. Abouhanna, he notes, "Patient with intermittent pedal edema, putting feet up for 30 minutes or so when it worsens."  (R. 854).  But as that note indicates, Plaintiff was there because of purported back pain and there is no other mention nor prescription directed to this claim.  After a thorough search of these records, I can find no further reference or restriction in the treatment notes.

The issue, as correctly voiced by the ALJ, was not whether she suffered the condition, as such was acknowledged (R. 37, 60, 64), but whether it caused limitations that would prevent even sedentary work as she claimed.  At the hearing, Plaintiff indicated that she took Lasix daily for the condition and that it helped.  However, she also claimed that she couldn't work because she could neither sit nor stand for thirty minutes without her lower legs

---

[8]*See e.g.* R. 313, 386-87, 390, 393, 398-99, 401, 528, 534, 737, 740, 743, 746, 749, 754, 782, 785, 789, 794.

swelling and pain.  When the pain and swelling gets to the point that she cannot stand it, she has to lie down and prop her legs up for forty-five to ninety minutes.  On this claim, I may agree that the ALJ could have better articulated his conclusion that the record did not support such a claim.  However, when the record is considered, the finding that Plaintiff was not fully credible is supported by substantial evidence.  In summary, the record reveals the leg swelling is repeatedly described as intermittent.  The clinical findings on physical exam very often found no evidence of edema or calf pain and when it was found it was generally described as "trace."  Objective testing did not confirm the condition.  And, apart from the ER record referenced above, no doctor – in particular, no treating doctor – prescribed any limitations for the condition which was treated effectively by Lasix.  In sum, when considered in full, the record supports a conclusion that Plaintiff was substantially overstating her functional limitations from edema.[9]

Finally, Plaintiff complains of inaccurate findings concerning her depression, in particular, that treatment notes did not mention any depression and Plaintiff had no history of mental health treatment except for after her divorce.  Here, as Plaintiff contends, the medical record shows she was prescribed Lexapro for depression by her primary care doctor, Dr. Abouhanna, and later received some counseling.  And, diagnosis for depression was confirmed by consulting psychologist, Timothy Foster.  (R. 347).  Against this medical

---

[9]According to the VE, even if a claimant would have to elevate her legs to chair level, every hour and a half for fifteen to twenty minutes throughout the day, such individual could still perform sedentary sit-down jobs but would probably require an accommodation from the employer to do that.  (R. 84).

backdrop, I again find some merit in Plaintiff's complaint with the ALJ's reasoning but no basis for reversing the credibility finding.

Evidence from Dr. Abouhanna reveals that Plaintiff complained of depression "secondary to health and financial issues" on January 29, 2010.  (R. 390).  The doctor prescribed Lexapro 10 mg.  (R. 389).  In a follow-up appointment, she reported the medication helped some and the doctor increased the dosage to 20 mg.  Moreover, Plaintiff said she'd like a counselor.  (R. 392-93).  Plaintiff did see a psychiatrist, Harris Feinstein M.D., for several sessions in the first half of 2011 for continued problems with depression. (R. 536-71.)  And, Lexapro dosage was increased and Trazadone was added.  Later records indicate that she was still taking Lexapro in October 2011.  (R. 827).  In light of this record, I think the finding of no mental health treatment is simply inaccurate.  Were the mental health records more revealing of mental limitations and were this the only basis for the decision to discount her credibility about her mental health, the matter might require further review. However, the decision otherwise reflects that while the ALJ found her depression a severe impairment on the conclusion that her concentration, persistence, and pace were moderately limited (R. 37-38, 41), but the medical record offered no other support that her claim of significant limitations caused by her sadness.

This conclusion is clearly supported by the consultative evaluation by Dr. Foster and not contradicted by any records from her primary care doctor or Dr. Feinstein, the

psychiatrist.  Thus, Dr. Foster assessed no significant limitations.[10]  Dr. Abouhanna's treatment notes seldom reference the condition and reflect nothing concerning the functional import of her depression.  In his final note, Dr. Feinstein noted that Plaintiff thought her depression "waxes and wanes in particular to all her medical problems," and he concluded that "overall [Plaintiff] presents with multiple medical problems as well as hurt from the children, which may be part of her somatic concerns.  At this point in time I encourage her to follow up on her thyroid, continue her Lexapro 30 mg. a day, and continue to work on validating herself as she goes forward."  (R. 538).  Moreover, as the ALJ also noted, Plaintiff reported and had a competitive work history and she was found to be neurologically intact.  She cared for her daughter and an adopted child, and performed many routine household functions.  While she reported not liking to be around people, as Dr, Foster concluded, she was all the time.  Thus, when the ALJ's full rationale is considered, it offers accurate and record-based reasons for discounting Plaintiff's subjective claims.

Under the applicable standard, the ALJ may discount subjective claims by articulating adequate reasons for doing so.  Here, I conclude that the ALJ has stated adequate

---

[10]It is apparent that the ALJ relied upon the findings by Dr. Foster in his April 2010 consultative report.  (R. 40-41).  In that report, Dr. Foster diagnosed depressive disorder, but he found "no severe functional limits from mental at this time."  (R. 347).  At that time, she reported no prior psychiatric hospitalizations nor care by a psychiatrist and that she did not like being around people.  However, based on his interview and mental status examination, Dr. Foster noted that although she did not like being around people, she was around them most of the time; she shops, prepares meals for others, and sees her boyfriend daily.  She also did dishes and laundry without problems and her memory and concentration were in normal limits.  (R. 346-47).  In sum, the report of this consulting examiner does not support Plaintiff's claims for significantly disabling mental limitations.

reasons which find support in the medical and other evidence.  Plaintiff does not demonstrate otherwise and she is not entitled to relief on this second claim.

Finally, Plaintiff claims the case should be remanded to the Appeals Council under either sentence four or six of 42 U.S.C. § 405(g).  She urges the case needs further review in light of the December 27, 2011, MRI report from Rose Radiology.  (R. 891-93).  According to Plaintiff's argument, this report confirmed her degenerative disc disease as well as retrolisthesis at L4-L5 and a small disc protrusion.  Given that the MRI was taken just seven days after the decision, the Appeals Council erred by concluding that the report was irrelevant and did not affect the decision that she was not disabled as of the date of decision.  Plaintiff argues in the alternative that the case should be remanded under sentence six for consideration of the new and material evidence.

The Commissioner responds that even if the report is considered relevant, it is insufficient to establish additional functional limitations that would change the administrative result.  Moreover, the spinal impairment does not satisfy the durational requirements of the Regulations, which prescribe that a claimant must show impairments and an inability to work lasting a continuous twelve months.  Here, the condition is first noted in July 2011, just five months prior to the decision.

Section 405(g) of Title 42 authorizes a district court to remand an application for benefits to the Commissioner by two methods, commonly denominated as "sentence four remands" and "sentence six remands."  Each sentence "remedies a separate problem."  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007).  The fourth sentence of section 405(g) provides the federal court "power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for rehearing." *Id.* In accordance with *Ingram*, under sentence four when a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous. *Id.* at 1262. In essence, the Appeals Council's denial of a request for review is part of the "final decision" of the Commissioner and is subject to judicial review. *Id.* at 1264. On the other hand, "[s]entence six of 42 U.S.C. section 405(g) provides the sole means for a district court to remand to the Commissioner to consider new evidence presented for the first time to the district court." *Id.* at 1267. Thus, under sentence six of 42 U.S.C. § 405(g), a court may remand a case to the Commissioner "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Stated otherwise, to demonstrate that a remand for consideration of new evidence is appropriate, the Plaintiff must demonstrate that: (1) there is new, non-cumulative evidence; (2) the evidence is material, i.e., relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for the failure to submit the evidence at the administrative level. *See Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998); *Caulder v. Bowen*, 791 F.2d 872, 877 (1986).

The Appeals Council's notice (R. 7-9) reveals that sentence six is inapplicable in the circumstance of this case. The records from Dr. DiGeronimo, Rose Radiology, (and from Pulmonary & Sleep of Tampa Bay) were first submitted to the Appeals Council. Under sentence four, the issue is "whether the Appeals Council correctly decided that the '[ALJ]'s

action, findings, or conclusion is [not] contrary to the weight of the evidence of record.'"

*Ingram* at 1266-67 (citing 20 C.F.R. § 404.970(b)).[11]  By my consideration of the whole of the

administrative and medical records,[12] the Appeals Council correctly concluded that the

decision was not contrary to the evidence.

As for the records from Dr. DiGeronimo, a fair review of those records (R. 883-89)

leads to the conclusion that the Appeals Council properly decided that such did not provide a

basis for changing the ALJ's decision. Nothing offered by this doctor would support a

contrary finding to that reached in the decision nor dictate a finding that Plaintiff was more

limited than as assessed by the ALJ, much less rendered disabled by her back condition.  As

for the MRI report from Rose Radiology, while I agree with Plaintiff that it arguably relates to

Plaintiff's condition as of the date of the decision rendered just seven days previous,[13] the

Appeals Council conclusion that it does not affect the decision about Plaintiff's disability on

or before the date of decision is correct.

---

[11]This Regulation provides, in pertinent part, that "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision.  It will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. § 404.970(b).

[12]Plaintiff does not here argue the records from Pulmonary & Sleep of Tampa Bay should require a remand.

[13]According to Plaintiff, these results were not submitted to the Appeals Council until June 2012.  From the record, it appears there were no follow-up records from Dr. DiGeronimo submitted.

The findings in this MRI revealed "3-4 mm of retrolisthesis of L4 on L5," a "small disc protrusion into the left neural foramen" at L5/S1.  The bulge was "not compressing the left L5 nerve root" and "the neural foraminal narrowing [was] minimal."  Impression was for degenerative disc disease L4/5 and L5/S1.  (R. 891-92).  Even if the scan confirmed a degenerative condition in the lumbar spine, these records do not speak to any functional limitations.  Notably, there are no follow-up records from Dr. DiGeronimo or another doctor assessing the significance of the report and it simply does not compel a conclusion that the case required further review.  In short, the records from Dr. DiGeronimo and Rose Radiology offer no basis for a conclusion that the denial of benefits was erroneous.

### D.

For the foregoing reasons, the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence, and I recommend that it be affirmed.  I further recommend that the Clerk be directed to enter Judgment in favor of the Defendant and to close the file.

Respectfully submitted this
7th day of January 2015.


THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6.

Copies furnished to:
The Honorable Steven D. Merryday, United States District Judge
Counsel of Record

28